# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *12850 Jersey Street* | ) ) | Case No. 2:22-MJ-00525 |
| *Corona, California 92880* | ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail fraud |
| 18 U.S.C. § 1343 | Wire fraud |
| 18 U.S.C. § 1159 | Misrepresentation of Indian produced goods |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sean Wesley Hyrons, Special Agent, U.S. Fish and Wildlife Service
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: Los Angeles, CA _____

_____
*Judge's signature*

Hon. Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA: Heather C. Gorman

### ATTACHMENT A

PREMISES TO BE SEARCHED

The premises located at 12850 Jersey Street, Corona, CA 92880, is further described as a single-family dwelling of approximately 3,683 square feet on an approximately .14-acre lot.  The house has two stories and is reported to have six bedrooms and three bathrooms with a three-car garage. The exterior of the residence is stucco/concrete and brick that is tan and brown in color with brick accents and decorative window shutters dark red/black in color.  The residence has covered porches on the north, east, and south side of the residence. The roof is a tile roof that is reddish brown in color.  The north, east, and west sides of the premises is surrounded by a concrete block and brick wall that is multicolored red, brown, and tan.  The front of the house faces south on Jersey Street and the rear of the house faces north on 65th Street.  The residence is the third house on the north side of Jersey Street when entering north from Angus Street.







The street view of the SUBJECT PREMISES taken from Google Earth.



The rear view of the SUBJECT PREMISES taken from Google Earth.



The street view of the SUBJECT PREMISES taken by FWS in October of 2021.

For 12850 Jersey Street, Corona, CA 92880, authority to search extends to all parts of the property, including any outbuildings, unattached garages, or workshops, inside containers, compartments, or safes located on the property, whether locked or not, or where the items described in Attachment B (list of items to be seized) could be found. Authority to search includes any vehicle located on the property that lists Claudine BUSHNELL as a registered owner.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1159 (Misrepresentation of Indian produced goods and Products) (the "Subject Offenses"), namely:

a.   Records and information relating to the purchase, sale, production, alteration, shipment, receipt, authentication, provenance, valuation, and/or pricing of jewelry in the Indian and/or Native American style, including, but not limited to, correspondence, emails, letters, photographs, receipts, invoices, shipping records, bookkeeping records, checks, credit card statements, bank account statements, ledgers, notes, reports.

b.   Personal books, customer lists, and/or records reflecting names, addresses, telephone numbers, and other contact or identification data relating to the purchase, sale, production, shipment, authentication, and provenance of jewelry in the Indian and/or Native American style.

c.   Written materials relating to jewelry in the Indian and/or Native American style, including, but not limited to, books, magazines, pamphlets, and/or computer printouts.

d.   Records reflecting correspondence relating to the Indian Arts and Crafts Act.

e.   Records relating to correspondence with or about the Indian Arts and Crafts Board.

i

     f.   Records and information relating to the eBay Store A LION QUEEN'S DEN, the Etsy Shop TURQUOISE KACHINA, and/or the Ruby Lane Store TURQUOISE KACHINA.

     g.   Hallmarking/signature tool(s) with any combination of letters.

     h.   Records indicating property ownership and tenancy.

     i.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

     j.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

     4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

          a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

v

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress Claudine BUSHNELL's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Claudine BUSHNELL's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Sean Wesley Hyrons, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.    I am a Special Agent ("SA") with the United States Fish and Wildlife Service ("FWS") Office of Law Enforcement and have been so employed since November 2018.  Prior to joining the FWS, I worked as a SA for the Bureau of Land Management, Office of Law Enforcement and Security from January 2012 to November 2018.  Prior to working as a SA, I was a Bureau of Land Management Law Enforcement Ranger for approximately three years, a United States Forest Service Law Enforcement Officer for approximately eight years and a City of Orlando Police Officer for approximately two years.  I have received and completed formal training that included a twelve-week Criminal Investigator training program in Glynco, Georgia.  I have training and experience in the investigation of crimes relating to the theft, fraud, trafficking, and destruction of natural and cultural resources, with a special emphasis on Native American items.  I have investigated violations of the Indian Arts and Crafts Act and have become familiar with the tactics and techniques associated with fraudulent activities involving trade in Native American-style items.  Specifically, I have learned how fraudulent pieces of jewelry are manufactured and then distributed throughout the United States and sold as authentic Native American jewelry.  I am familiar with the marketing methods used to deceive consumers.  I am also familiar with the

Native American jewelry market and how it is valued and advertised as made by a particular Native American artisan.  I have personally been involved in obtaining federal search and arrest warrants, and I have directed, coordinated, and assisted other law enforcement officers in the executions of these warrants.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.   This affidavit is made in support of a search warrant for 12850 Jersey Street, Corona, CA 92880 (the "SUBJECT PREMISES") described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1159 (Misrepresentation of Indian Produced Goods and Products).

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. <u>STATUTORY OVERVIEW</u>

4.   In 1990, in response to growing sales of counterfeit Native American arts and crafts negatively impacting the sale of authentic Native American products, Congress passed the Indian

Arts and Crafts Act of 1990 ("IACA").  The IACA is a truth-in-advertising law meant to punish individuals who falsely market products as "Indian" or "Indian Made" when the products are not, in fact, made by Indians as defined by IACA.

5.   Under the IACA, it is unlawful to offer or display for sale or sell any good, with or without a Government trademark, that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization, resident within the United States. 18 U.S.C. § 1159(a).

6.   As used in the statute, the term "Indian" means any individual who is a member of an Indian tribe, or for the purposes of the section is certified as an Indian artisan by an Indian tribe.  18 U.S.C. § 1159(c)(1); 25 C.F.R. § 309.2(a). The term "Indian tribe" includes any Indian tribe, band, nation, Alaska Native village or any organized group or community which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians; or any Indian group that has been formally recognized as an Indian tribe by a State legislature or by a State commission or similar organization legislatively vested with State tribal recognition authority.  18 U.S.C. § 1159(c)(3); 25 C.F.R. § 309.2(e).

7.   The term "Indian product" means any art or craft product made by an Indian, which means that an Indian has provided the artistic or craft work labor necessary to implement an artistic design through a substantial transformation of

3

materials to produce the art or craft work.  18 U.S.C.
§ 1159(c)(2); 25 C.F.R. § 309.2(b).  Although it may include
more than one Indian working together, the labor component of
the product must be entirely Indian for the Indian art or craft
object to be an "Indian product."  Id.

8.   The term "product of a particular Indian tribe or
Indian arts and crafts organization" means that the origin of
the product is identified as a named Indian tribe or named
Indian arts and crafts organization.  18 U.S.C. § 1159(c)(2); 25
C.F.R. § 309.2(f).  An "Indian arts and crafts organization" is
any legally established arts and crafts marketing organization
composed of members of Indian tribes.  18 U.S.C. § 1159(c)(4).

9.   Under federal regulations, the unqualified use of the
term "Indian" or of the term "Native American" or the
unqualified use of the name of an Indian tribe, in connection
with an art or craft product, is interpreted to mean that (1)
the maker is a member of an Indian tribe, is certified by an
Indian tribe as a non-member Indian artisan, or is a member of
the particular Indian tribe named; and (2) the art or craft
product is an Indian product.  25 C.F.R. § 309.24(a).  In
addition, the unqualified use of the name of a foreign tribe,
regardless of any country-of-origin marking on the product, is
interpreted to mean, among other things, that the tribe is
resident in the United States, unless the name of the foreign
country of tribal ancestry is clearly disclosed in conjunction
with marketing the art or craft.  See 25 C.F.R. § 309.24(b),
(c).

4

10.   An individual that knowingly violates IACA where the applicable goods are offered or displayed for sale at a total price of $1,000 or more, or if the applicable goods are sold for a total price of $1,000 or more is guilty of a felony.  18 U.S.C. § 1159(b)(1)(A).  An individual that knowingly violates IACA where the applicable goods are offered or displayed for sale at a total price of less than $1,000, or if the applicable goods are sold for a total price of less than $1,000 is guilty of a misdemeanor.  18 U.S.C. § 1159(b)(1)(B).

## V. SUMMARY OF PROBABLE CAUSE

11.   The FWS is currently investigating the sale of jewelry that is being falsely represented as made by artists of Native American descent, in violation of the IACA.  Through undercover operations, the FWS obtained jewelry pieces that were attributed to Hopi artist Charles Loloma and Navajo artist Monty Claw.  It was confirmed that the jewelry pieces were not made by the artists to which they were attributed.  The seller uses the online retail platforms eBay and Etsy, as well as the United States Postal Service, to facilitate the transactions.  As of January 25, 2022, the seller offered approximately 2,000 items for sale on eBay and Etsy that were described as Navajo, Hopi, or Zuni.  As set forth below, the SUBJECT PREMISES has been identified as the seller's residence and the location from which the seller operates her business.

//

//

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

<u>The "Loloma" Bracelet Purchase</u>

12.  On September 3, 2020, FWS received a complaint from
Robert Rhodes about a counterfeit Charles Loloma bracelet being
advertised for sale on eBay; the complaint contained a link to
the item.  Based on what I have learned during this
investigation and from other law enforcement officers who
investigate IACA violations, I know that Charles Loloma (1921-
1991) is said to be one of the most, if not the most,
significant Indian artists of the twentieth century.  Loloma was
of Hopi ancestry and found fame throughout his lifetime because
of his artistic talent.  As a result, his work has become highly
collectible.  Loloma's pieces regularly sell for thousands of
dollars and have brought as much as $75,000.00 for a single
piece.  Consequently, a market for fraudulent Loloma pieces has
developed.  Fraudulent pieces began appearing on the market in
2009.

13.  On September 8, 2020, I followed the link provided in
the complaint from Robert Rhodes and it took me to an eBay
listing for a bracelet offered for sale by eBay user
"alionqueen."  The bracelet was described as a "CHARLES LOLOMA
Tufa Cast Sterling Silver LANDER BLUE TURQUOISE Cuff BRACELET"
with an advertised price of $13,225.00.[1]  The "Tribal

---

[1] Based on what I have learned during the investigation, I
believe that this bracelet was originally purchased by
alionqueen from another eBay user on or about May 24, 2020.  I
have reviewed alionqueen's eBay transactions and communications
that were obtained pursuant to a search warrant (described
*(footnote cont'd on next page)*

Affiliation" provided for the bracelet was "Hopi" and the
"Brand" provided was "Native American."  I also learned that
alionqueen had an eBay Store called A LION QUEEN's DEN that
listed the items offered for sale by alionqueen.

14.  After reviewing the eBay listing for the bracelet, I
queried a LeadsOnline database, available at leadsonline.com,
for eBay information related to eBay user alionqueen.  Based on
my training and experience, I know that LeadsOnline offers a
subscription service available to law enforcement that, among
other things, provides access to certain eBay information,
including eBay users' account information, active listings for
eBay users, purchase and sales information for the prior three
months, and the buyers and sellers involved in eBay
transactions.  According to the LeadsOnline database, the eBay
user alionqueen was registered to Claudine BUSHNELL, located in
Corona, California.

15.  On September 8, 2020, FWS Resident Agent in Charge
("RAC") Zachary Oper and I called Robert Rhodes ("Rhodes") and
Verma Nequatewa ("Nequatewa") about the bracelet attributed to
Charles Loloma that was offered for sale at the link previously

_____

further below).  Based on that review, I learned that alionqueen
purchased a bracelet on eBay described as "Charles Loloma Silver
Turfa Bracelet Signed" on May 24, 2020.  I also learned that
alionqueen exchanged messages in June 2020 with eBay user
"Shabbeyrd," who expressed interest in purchasing a Loloma
bracelet.  In those messages, alionqueen confirmed that she
recently purchased a bracelet that she would be listing for
sale.  Later, in September 2020, after alionqueen had listed a
bracelet for sale, described as "CHARLES LOLOMA Tufa Cast
Sterling Silver LANDER BLUE TURQUOISE Cuff BRACELET," Shabbeyrd
sent alionqueen a message about the minimum price alionqueen
would accept for the bracelet listed for sale.  Ultimately,
Shabbeyrd did not purchase the bracelet.

provided by Rhodes.  Rhodes and Nequatewa are Charles Loloma
jewelry experts that FWS has used in past investigations.  Based
on my experience in prior investigations, I know that Nequatewa
is Loloma's niece and worked with him from the 1960's until his
death in 1991.  Loloma did most of the single stone settings and
metalwork, while Nequatewa made most of the inlay jewelry.
Rhodes, who is married to Nequatewa, was Loloma's business
manager.  Rhodes handled the invoices, payments, and deposits
for Loloma's jewelry sales.

16.  During the conversation with Rhodes and Nequatewa,
both indicated that they were 100% certain that the bracelet was
a counterfeit.  Rhodes and Nequatewa believed the bracelet to be
a fake based on the design of the bracelet and the placement of
the hallmark on the bracelet.

17.  On September 8, 2020, while acting in an undercover
capacity, I sent a message through eBay (using the "Contact
Seller" link) to alionqueen, and asked if the seller had
provenance on the Charles Loloma bracelet.

18.  On September 9, 2020, alionqueen replied to my message
with the following message: "Hi Savanna. Thank you for your
interest. No, sorry. I do not have provenance on the Bracelet.
It has however been authenticated by several of my trusted
experts Thanks again. Blessings, Claudine."  I noted that the
message was signed by "Claudine," the same name that I learned
was associated the eBay user alionqueen (i.e., Claudine
BUSHNELL).

19.  On September 9, 2020, while acting in an undercover capacity, I purchased the bracelet offered for sale by eBay user alionqueen attributed to Charles Loloma for $12,526.01.

20.  On September 15, 2020, I picked up a package sent from BUSHNELL that was delivered by the United States Postal Service to a FWS covert mailbox in Santa Fe, New Mexico.  The package had a return address of Claudine BUSHNELL, P.O. BOX 143, Norco, CA 92860-0143.  The package contained the bracelet attributed to Charles Loloma, two business cards, and miscellaneous packing material.  Both of the business cards provided BUSHNELL's name and telephone number, as well as the name of her eBay Store: A LION QUEEN'S DEN.  One of the business cards listed the following businesses and social media websites:

- eBay Store: A LION QUEEN'S DEN
- Etsy Store: TURQUOISE KACHINA
- Ruby Lane Store: TURQUOISE KACHINA
- Instagram: TURQUOISE_KACHINA

BUSHNELL's Address

21.  On September 15 and 16, 2020, I conducted an open internet search for the businesses and social media websites listed on BUSHNELL's business cards.  The Instagram page TURQUOISE_KACHINA provided quick links to BUSHNELL's eBay Store A LION QUEEN'S DEN, Etsy Shop TURQUOISE KACHINA, Facebook page A LION'S DEN/TURQUOISE KACHINA, and Pinterest page A LION QUEEN'S DEN.  BUSHNELL's Etsy Shop stated that the store was located in Corona, California and listed the shop owner as Claudine BUSHNELL-MINDER.  BUSHNELL'S Pinterest page had quick links to

both her eBay Store and Etsy Shop.  BUSHNELL's Facebook page
also had a quick link to her eBay Store and her Instagram page,
and also listed her mobile telephone number, which was the same
number that was listed on her business card.  BUSHNELL's
Instagram and Facebook pages also listed her as Claudine
BUSHNELL-MINDER.  I was unable to find a Ruby Lane Store by the
name of TURQUOISE KACHINA.  In addition, I did not find any of
BUSHNELL's businesses registered with the California Secretary
of State.

22.  The same days, I queried the TransUnion TLOxp database
for the name Claudine BUSHNELL in California.  During the
search, I discovered an individual from California by the name
of Claudine Natalie BUSHNELL, who is also known as Claudine
Natalie GOLDBERG.  The database search showed several phone
numbers associated with BUSHNELL, which included a mobile
telephone number.  The telephone number matched the number
listed on BUSHNELL's Facebook page, BUSHNELL's eBay Store A LION
QUEEN'S DEN, BUSHNELL's business cards, and in the LeadsOnline
database.  The search also disclosed an email address of
alionqueen@juno.com, which is the same email address provided in
the LeadsOnline database for the eBay user alionqueen.  The
TransUnion TLOxp database reflected current addresses for
BUSHNELL as P.O. Box 143, Norco, CA 92860-0143 and 12850 Jersey
Street, Corona, CA 92880-8942 (i.e., the SUBJECT PREMISES).  The
P.O. Box 143, Norco, CA 92860-0143 is the address listed on one
of BUSHNELL's business cards and the return address listed on
the package that I received from BUSHNELL.  The TransUnion TLOxp

database also listed Gerald Minder as a relative of BUSHNELL and listed P.O. Box 143, Norco, CA 92860-0143, as an address for Gerald Minder.

23.  Also on September 15 and 16, 2020, I visited the Riverside County Assessor's website to determine the owner of the SUBJECT PREMISES, which was the physical address provided for BUSHNELL in the TransUnion TLOxp database.  The Riverside County Assessor's website listed Gerald Minder as the owner of the SUBJECT PREMISES.

24.  During my review of BUSHNELL's Instagram page, I saw a photograph of a man and woman with the following post: "Happy Birthday to my partner in crime, my better half, the love of my life."  I then compared the Instagram photograph to California driver's license photographs of BUSHNELL and Gerald Minder. Based on my comparison of the Instagram photograph to the driver's license photographs, I believe that the Instagram photograph depicted BUSHNELL and Gerald Minder.

25.  On September 17, 2020, while acting in an undercover capacity, I sent a message addressed to "Claudine" through eBay to alionqueen, and asked if she operated her business from her home or if she had "an actual store."  The same day alionqueen responded to my message, and stated that she did not have a "brick and mortar store."  The message was signed "Blessings, Claudine."

The "Monty Claw" Bracelet

26.  On September 15, 2020, I reviewed the eBay store A LION QUEEN'S DEN, which was associated with eBay user

11

alionqueen.  During that review, I observed two bracelets and one pendant attributed to Monty Claw ("Claw") offered for sale. Based on my experience in prior investigations, I know that Claw is an artist of Navajo descent who makes jewelry, among other things.  I downloaded the photographs from the website and emailed them to Claw to determine if the bracelets and pendant were made by him.

27.  On September 16, 2020, Claw responded to me and indicated that one of the bracelets was not made by him, but that the other two items were.  Claw sent me a photograph of the bracelet that he indicated was not made by him.

28.  The bracelet that Claw indicated was not made by him was described in an eBay listing offered for sale by alionqueen as a "Vintage NAVAJO TUFA CAST Sterling Silver NEVADA BLUE TURQUOISE Cuff BRACELET." The eBay listing attributed the bracelet to Claw with a "Buy It Now" price of $1,549.35.  The "Tribal Affiliation" provided for the piece was "Navajo" and the "Brand" provided was "Native American."  I also reviewed BUSHNELL's Etsy Shop TURQUOISE KACHINA and observed the same bracelet for sale, which was attributed to Claw.

29.  On September 16, 2020, I spoke to Claw by telephone. During the conversation, Claw and I logged into the eBay Store A LION QUEEN'S DEN and navigated to the eBay listing for the bracelet.  Claw reviewed the photographs of the bracelet in the eBay listing and Claw indicated that he did not make the bracelet.  Claw told me that he places a hallmark on all his artwork and that the bracelet did not have his hallmark.

12

Additionally, Claw stated that the piece resembled a Hopi design and that he was Navajo.

30.   On September 17, 2020, while acting in an undercover capacity, I sent a message through eBay to alionqueen about the "Vintage NAVAJO TUFA CAST Sterling Silver NEVADA BLUE TURQUOISE Cuff BRACELET" that was attributed to Claw.  In the message, I asked if the hallmark/design on the inside of the bracelet was Claw's hallmark.

31.   On September 17, 2020, eBay user alionqueen replied to my message with the following message: "Hi Jessica. Yes, that is one of his signatures. Thanks again. Blessings, Claudine."

32.   On September 18, 2020, while acting in an undercover capacity, I purchased the bracelet attributed to Claw offered for sale by eBay user alionqueen for $1,397.95.

33.   On September 22, 2020, FWS SA Adrienne Ruiz picked up a package sent from BUSHNELL that was delivered by the United States Postal Service to a FWS covert mailbox in Albuquerque, New Mexico.  The package had a return address of Claudine BUSHNELL, P.O. BOX 143, Norco, CA 92860-0143.  The package contained the bracelet attributed to Claw, two business cards, and miscellaneous packing material.  The business cards were the same as the business cards I received in the package containing the bracelet attributed to Loloma that I purchased from alionqueen.

34.   On September 25, 2020, I interviewed Claw in Gallup, New Mexico, about the "Vintage NAVAJO TUFA CAST Sterling Silver NEVADA BLUE TURQUOISE Cuff BRACELET" attributed to him in

alionqueen's eBay listing for the bracelet.  During the
interview, I showed Claw the bracelet.  Claw reconfirmed that
the bracelet was not his and that the bracelet resembled a Hopi
design.  Claw pointed out that the bracelet did not have his
hallmark and showed me examples of his current hallmarks, which
did not match the hallmark on the bracelet.  Claw went on to
state that he marked all his jewelry with his hallmark except
for smaller pieces such as earrings, which he usually initialed
with MC.

"Loloma" Bracelet Examination

        35.  On September 29, 2020, RAC Oper and I interviewed
Rhodes and Nequatewa at their residence about the "Tufa Cast
Sterling Silver LANDER BLUE TURQUOISE Cuff BRACELET" attributed
to Loloma by alionqueen in the eBay listing.  Both Rhodes and
Nequatewa examined the bracelet and made numerous observations
about the bracelet that were not consistent with Charles Loloma
bracelets and/or jewelry.  Rhodes then photographed the bracelet
and stated that Nequatewa would review the photographs and
complete a statement about her observations.

        36.  On October 2, 2020, I received an email from Rhodes
with Nequatewa's written statement containing her observations
of the bracelet attributed to Charles Loloma by alionqueen in
the eBay listing.  In the statement, Nequatewa confirmed that
the bracelet was neither made by Charles Loloma nor made at the
Loloma Studio.  Nequatewa identified various characteristics and
features that led her to conclude that the bracelet was not a

Loloma, including among other things, the signature, the
hallmark, the shape, the ridges, and the stone settings.

37.   On November 10, 2020, the National Fish and Wildlife
Forensic Laboratory ("NFWFL") completed an examination and
comparison of two known Charles Loloma bracelets engraved with
Loloma's hallmark with the bracelet that I purchased from
alionqueen.  According to NFWFL Supervisory Forensic Scientist
Dr. Edgard O. Espinoza, the hallmark on the bracelet that I
purchased from alionqueen does not share class characteristics
with either of the known Charles Loloma hallmarks.  Dr. Espinoza
also concluded that the hallmark on the bracelet purchased from
alionqueen was made with a different tool than that used in
either of the two known Charles Loloma hallmarks.

38.   On December 7 and 12, 2020, I reviewed the eBay Store
A LION QUEEN'S DEN, which was associated with eBay user
alionqueen.  During my review of the webpage, I discovered
multiple pieces of jewelry offered for sale by alionqueen that
were attributed to artist David R. Freeland Jr.  In my review of
the eBay listings for those jewelry pieces, I noticed that the
"Tribal Affiliation" provided for the pieces was "Metis" and the
"Brand" provided for the pieces was "Native American."  The eBay
listings did not identify any foreign country of tribal ancestry
associated with the jewelry pieces.

39.   On January 25, 2022, I spoke to Meridith Stanton,
Director of the Indian Arts and Crafts Board.  Ms. Stanton
informed me that the Metis are not a federally recognized Indian
tribe in the United States and, to the best of her knowledge,

15

the Metis is not a recognized Indian tribe by any State in the United States.  Based on what I have learned in this investigation, I know that Metis are one of the Aboriginal peoples of Canada.

40.  During this investigation, and most recently on January 25, 2022, I have reviewed David R. Freeland Jr.'s website, available at davidfreelandopals.com.  According to the website, Freeland is an artist based in Arizona who makes jewelry and whose inspiration comes from "the rich cultural heritage of the Southwest and his father who traded with Native American craftsmen."  The website does not identify Freeland as Metis or Native American.  I have reviewed Freeland's social media website, which does not identify Freeland as Metis or Native American.  To date, I have found no information through this investigation to confirm that Freeland is, in fact, Metis.

41.  On June 9, 2021, I revisited the eBay Store A LION QUEEN'S DEN, which contains the items offered for sale by alionqueen, and reviewed the sales listings for David Freeland's jewelry.  I observed four items for sale by alionqueen attributed to David Freeland Jr.  All four listings described Freeland as Metis and/or Native American.

Facebook Private Group

42.  On April 16, 2021, I reviewed the Facebook private group called "Identifying FAKE Native American Jewelry," and learned that BUSHNELL was a member of the group and had been a member since June 2, 2020.

43.   The webpage for the Facebook private group was
described as follows: "A group tailored to new and beginning
collectors, we are dedicated to identifying, discussing and
bringing awareness to FAKE Native American made jewelry, all
while promoting the work of living Native American jewelry
artists you can buy from directly."  I noticed that members of
the group had posted information related to the IACA.  For
example, one post, dated August 5, 2020, provided the following
information on IACA: "The Indian Arts and Crafts Act (IACA) of
1990 is a truth-in-advertising law which prohibits
misrepresentation in marketing of American Indian or Alaska
Native arts and crafts products within the United States. It is
illegal to offer or display for sale, or sell any art or craft
product in a manner that falsely suggests it is Indian produced,
an Indian product, or the product of a particular Indian or
Indian Tribe or Indian arts and crafts organization, resident
within the United States. . . ."  Below the post was a link to
the Indian Arts and Crafts Board webpage that described the
IACA.  The IACA post was also listed under the discussion and
announcement tabs on the webpage for the Facebook private group.

44.   On June 9, 2021, I revisited the Facebook private
group webpage, and I found several discussion threads that
included posts by BUSHNELL.  One such discussion that BUSHNELL
participated in, dated April 30, 2021, referred to the IACA as
it related to advertising and representing jewelry and art of
indigenous/native persons that are not from the United States.
The discussion revolved around Federico Jimenez, an artist from

Oaxaca, Mexico, who is believed to be an indigenous/native
artist.  Part of the discussion addressed Federico Jimenez being
described as Native American or Indian.  One of the
administrators of the Facebook private group posted the
following: "Does anyone know if FJ is a member of a federally
recognized US tribe? I'm not trying to ruffle feathers here or
demonize this guy.  This work is outstanding but his work also
often gets misrepresented by resellers who think his designs are
NA, and I definitely see why someone may think that.  I don't
disagree that indigenous peoples from Mexico are also Native,
but for collecting purposes, if the maker of the jewelry is not
a member of a federally recognized tribe within the US then that
jewelry cannot be sold as Native made.  If jewelry is being sold
by an individual who does not meet that criteria than it cannot
be sold as NA.  I know it's a silly concept, that a law or legal
document is the deciding factor on what can and cannot be
described as NA, but those protections are in place for a
reason. . . ."  Based on my review of the discussion thread and
other posts on the Facebook private group, I understood the
abbreviation NA to refer to Native American.

Surveillance of the SUBJECT PREMISES

45.  On October 20, 2020, I queried the LeadsOnline
database to determine if BUSHNELL had recently sold any
merchandise on eBay. According to LeadsOnline, eBay user
alionqueen sold two items on October 19, 2020.  Based on the
sale of those items, I believed that BUSHNELL might ship the

sold items to her customers using her P.O. Box account in Norco, California in the next several days.

46.   On October 20, 2020, RAC Oper and I conducted surveillance at BUSHNELL's residence (i.e., the SUBJECT PREMISES).  I saw a Mercedes Benz with California license plate "LIONQEN" pull out of the garage.  An NCIC check subsequently revealed that California license plate "LIONQEN" belonged to a 2012 Mercedes Benz, registered to BUSHNELL, P.O. Box 143, Norco, CA 92860.

47.   When the car pulled onto the road, I recognized the driver as BUSHNELL from her California driver's license photograph and from photographs on her Facebook and Instagram pages.  BUSHNELL began driving in the direction of the Norco Post Office.

48.   A short time later, I saw BUSHNELL enter the parking lot of the Norco Post Office.  BUSHNELL got out of her car carrying a bag that appeared to contain items in it and walked into the post office.  I lost sight of BUSHNELL for a few minutes, and when I found her inside the post office, I saw BUSHNELL sorting her mail at a countertop with her bag next to her that appeared to be empty.

49.   BUSHNELL subsequently walked out of the post office with what appeared to be an empty bag, got back into her car, and returned to the SUBJECT PREMISES.  Based on my observations, I believed that BUSHNELL dropped off pre-postmarked packages at the post office.

50.  On October 26, 2021, RAC Oper and I again conducted surveillance on the SUBJECT PREMISES.  During the surveillance, I saw a dark colored Jeep pickup truck parked in the driveway with California license plate "49750Y2."  According to an NCIC check, the vehicle was registered to Gerald W. Minder and BUSHNELL.

51.  On October 27, 2021, RAC Oper continued surveillance on the SUBJECT PREMISES.  I saw a man and woman in the driveway of the SUBJECT PREMISES who I recognized as Gerald Minder and BUSHNELL based on California driver's license photographs.  I also saw the Mercedes Benz registered to BUSHNELL parked in the driveway.

eBay and Etsy Search Warrants

52.  On March 15, 2021, the Honorable Jerry H. Ritter, United States Magistrate Judge, District of New Mexico, issued a search warrant for the eBay user identified as "alionqueen" in case no. 21-MR-338.  Based on my review of the eBay materials obtained pursuant to the search warrant, I learned that the eBay account was registered to BUSHNELL with an address at the SUBJECT PREMISES.  The information that I received also indicated that, at various times, the subscriber logged into the eBay account using a Windows operating system and OS X operating system.  Based on my experience and what I have learned during this investigation, I know that Windows and OS X are operating systems for computers.

53.  On March 15, 2021, the Honorable Jerry H. Ritter, United States Magistrate Judge, District of New Mexico, issued a

search warrant for the Etsy shop TURQUOISE KACHINA
https://www.etsy.com/shop/turquoisekachina in case no. 21-MR-
340.  Based on my review of the Etsy materials obtained pursuant
to the search warrant, I learned that the subscriber for the
Etsy account was BUSHNELL with an address at the SUBJECT
PREMISES.  The information that I received also indicated that
during the period from March 7, 2021, to April 13, 2021, the
subscriber logged into the Etsy account using a browser on
iPhone OS 14 and using a Chrome browser on Windows 10.  Based on
my experience and what I have learned during this investigation,
I know that iPhone OS 14 refers to a mobile phone operating
system and that that Windows 10 is a computer operating system.
Furthermore, I know that various versions of iPhones contain
biometric unlock features.

    54.  On January 25, 2022, I visited the webpages for
BUSHNELL's eBay Store and Etsy Shop.  The webpages were still
active and offered Native American style jewelry pieces for
sale.  I learned the following information based on my review of
the webpages.

        a.  The eBay Store A LION QUEEN's DEN stated the
following in the "About us" section: "Welcome to the Best Place
to buy Authentic Native American Jewelry (Vintage, Old Pawn and
Contemporary). Artisans from all Tribes: Navajo (Dine), Zuni,
Hopi, Kewa (Santo Domingo Pueblo).  Designs made from Sterling
Silver, Gold, Turquoise, Coral, Inlay, Tufa, Sand Cast, Beads,
and more.  Thank you for supporting my 22 years of selling on
eBay!"  A total of 2,426 items were listed for sale.  I searched

the eBay Store listings for the names of three federally recognized tribes in the United States: Navajo, Hopi, and Zuni. Over 1,700 items had Navajo in the description, 25 items had Hopi in the description, and 233 items had Zuni in the description.

        b.    The Etsy shop TURQUOISE KACHINA contained the following message: "WELCOME to the Best Place to buy unique Authentic Vintage Native American Jewelry (Estate and Old Pawn). Artisans from all Tribes: Navajo (Dine), Zuni, Hopi, Kewa (Santo Domingo Pueblo). Designs made from Sterling Silver, Gold, Turquoise, Coral, Inlay, Tufa, Sand Cast, Beads, and more."  A total of 2,311 items were listed for sale.  I searched the Etsy Shop listings for Navajo, Hopi, and Zuni.  Over 1,652 items had Navajo in the description, 97 items had Hopi in the description, and 271 items had Zuni in the description.

    55.  Based on my experience and knowledge obtained from other law enforcement personnel, I know that ecommerce businesses such as BUSHNELL's, which do not have storefront locations, often operate from the residence of the business owners.  I also know that such businesses often keep the following at the owner's residence: documents, books, records, and materials related to the business; documents concerning any regulatory or governing information related to the business; information concerning the subject-matter of the business; customer information; and merchandise/inventory.

## VIII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

56.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the

23

form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

57.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

58.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

        c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BUSHNELL's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of BUSHNELL's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    59.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. <u>CONCLUSION</u>

    60.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1159 (Misrepresentation of Indian Produced Goods and Products) will be found at the SUBJECT PREMISES, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
_____, 2022.

_____
HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE

26